J-A05026-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ALLEGHENY CLINIC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DR. ZIDNIA CONDE-COLON AND | : | No. 260 WDA 2024 |
| SOUTH HILLS RADIOLOGY | : | |
| ASSOCIATES | : | |

Appeal from the Order Entered January 22, 2024
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-22-008352

BEFORE: MURRAY, J., KING, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY KING, J.: **FILED: October 7, 2025**

Appellant, Allegheny Clinic, appeals from the order entered in the Allegheny County Court of Common Pleas, which denied its motion for summary judgment and entered summary judgment in favor of Appellees, Dr. Zidnia Conde-Colon ("Doctor") and South Hills Radiology Associates ("SHRA"). We affirm.

In its opinion, the trial court set forth the relevant facts and procedural history of this case as follows:

> This case arises out of a contractual dispute, specifically the enforcement of a non-compete clause in an Employment Agreement between [Allegheny Clinic] and [Doctor]. A tortious interference claim relating to the contract at issue has also been asserted against [SHRA]. Allegheny Clinic is a wholly-owned subsidiary of Allegheny Health Network

---

[*] Retired Senior Judge assigned to the Superior Court.

("AHN"), and Allegheny Clinic operates healthcare facilities throughout the Western Pennsylvania area. [Doctor] is a radiologist at [SHRA]. SHRA is a Pennsylvania professional corporation owned solely by physicians/radiologists practicing exclusively at St. Clair Hospital.

[Doctor] is a breast radiologist whose employment with Allegheny Clinic began with a fellowship with Allegheny General Hospital (which was later acquired by Allegheny Clinic). In 2019, she signed a new Employment Agreement with Allegheny Clinic, which included the following non-compete clause:

> For a period of One (1) year(s) following the end of Physician's employment with [Allegheny Clinic ("AC")], (the "Period of Restriction") Physician shall not enter into any type of financial, ownership, strategic, or medical staff relationship with 1) UPMC and its affiliates as well as 2) **any other competitor of AC, AHN or other health care facility with which AC has had a contract, relationship or affiliation to provide professional radiology services.**

Allegheny Clinic's App. of Exs. in Supp. of Its Mot. for Summ. J., Ex. 2, at 3 (emphasis added). [In late 2020 through 2021, Doctor] began communicating with Dr. Klepchick—a radiologist at SHRA who formerly worked with [Doctor] at Allegheny Clinic—over text message. Dr. Klepchick [discussed with Doctor the possibility of Doctor] transitioning her employment to SHRA, and the parties' discussions largely concerned the feasibility of such a transition. … Dr. Klepchick herself had previously left Allegheny Clinic for SHRA, but her Allegheny Clinic Employment Agreement contained different non-compete language. [SHRA reviewed the above non-compete language in Doctor's employment agreement and informed Doctor that it would not prevent her from working at SHRA.]

[Doctor] ultimately decided to accept the opportunity SHRA provided her, signing an employment agreement with SHRA on October 14, 2021. She proffered a resignation letter to Allegheny Clinic two months later, wherein she detailed her new employment arrangements. In response, Allegheny

Clinic sent [Doctor] a letter on January 31, 2022, explaining that transitioning to SHRA would violate her Employment Agreement. [Doctor] went forward with the new employment arrangements, however, and formally began working for SHRA on July 5, 2022.

Shortly before [Doctor] began working for SHRA, on July 1, 2022, Allegheny Clinic initiated the present action by filing a complaint against her and SHRA. Allegheny Clinic alleged that [Doctor] had breached her non-compete clause by going to work for SHRA—a direct competitor to Allegheny Clinic (*i.e.*, Count II)—and that SHRA had tortiously interfered with the Employment Agreement by soliciting [Doctor] (*i.e.*, Count III). Count I requested preliminary and permanent injunctive relief against [Appellees[1]]. In their Answer, New Matter, and Counterclaim, [Appellees'] only Count requested declaratory judgment to declare that either the non-compete clause does not apply to [Doctor's] employment with SHRA or that the non-compete clause is unenforceable.

This [c]ourt heard argument on opposing Motions for Summary Judgment in 2023 and issued a pair of rulings on January 22, 2024. Allegheny Clinic's Motion was denied in its entirety, and [Appellees'] Motion was granted as to Count II; Count II was dismissed with prejudice. [Appellees'] Motion was denied as moot with regard to Count III, as was their Counterclaim for Declaratory Judgment. Allegheny Clinic filed a Notice of Appeal for each of these rulings on February 21, 2024. This [c]ourt ordered Allegheny Clinic to file a Concise Statement of Errors in accordance with Pennsylvania Rule of Appellate Procedure 1925(b) on February 27, 2024. Allegheny Clinic filed a Concise Statement of Errors on March 19, 2024.

(Trial Court Opinion, filed 7/18/24, at 1-3).

Allegheny Clinic raises three issues for our review:

---

[1] Allegheny Clinic abandoned its request for injunctive relief in subsequent filings. Because the one-year restrictive period in the non-compete clause has since passed, any claim for injunctive relief would be moot in any event.

Whether the trial court erred in granting Appellees' Motion for Summary Judgment on Allegheny Clinic's claim for breach of contract and denying Allegheny Clinic's Motion for Summary Judgment on that claim?

Whether the trial court erred in denying Allegheny Clinic's Motion for Summary Judgment on its claim for tortious interference with contract and denying Appellees' Motion for Summary Judgment on that claim as moot?

Whether the trial court erred in denying Allegheny Clinic's Motion for Summary Judgment on its claim for declaratory judgment?

(Allegheny Clinic's Brief at 5-6).[2]

Summary judgment is appropriate only where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. ***Summers v. Certainteed Corp.***, 606 Pa. 294, 307, 997 A.2d 1152, 1159 (2010). When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences in a light most favorable to the non-moving party. ***Id.*** In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment "where the right to such judgment is clear and free from all doubt." ***Id.***

Our Supreme Court has clarified this Court's role as follows:

On appellate review, … an appellate court may reverse a grant of summary judgment if there has been an error of

_____

[2] We have reordered Allegheny Clinic's issues to align them with the way they are presented in its appellate brief.

- 4 -

law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

***Valley Nat'l Bank v. Marchiano***, 221 A.3d 1220, 1222 (Pa.Super. 2019).

In its first issue, Allegheny Clinic argues that the non-compete clause in Doctor's employment agreement is enforceable because it is reasonable in both duration and scope. Allegheny Clinic submits that Appellees did not challenge the one-year duration in the non-compete clause. Although the trial court decided that the non-compete clause failed to state an express geographical limitation, Allegheny Clinic maintains that the non-compete clause contains an inherent geographical limitation. Allegheny Clinic complains that the trial court misinterpreted the plain language of the non-compete clause, and that the record supports enforcement of an inherent geographic limitation. Allegheny Clinic insists that the non-compete clause is limited to Southwestern Pennsylvania because SHRA and Allegheny Clinic operate in that same geographic area. Allegheny Clinic contends that the non-compete clause at issue here is analogous to the clause in ***Bell Fuel Corp v. Cattolico***, 544 A.2d 450, 458-59 (Pa.Super. 1988), *appeal denied*, 520 Pa. 612, 554 A.2d 505 (1989), in which this Court held a non-compete clause

enforceable because it was "inherently geographically limited in scope."[3] Allegheny Clinic concludes that the non-compete clause in this case is valid, and the trial court erred by granted summary judgment to Doctor on Allegheny Clinic's breach of contract count. We disagree.

While generally disfavored, Pennsylvania law has recognized the validity and enforceability of non-compete covenants in an employment agreement, assuming adherence to certain requirements. ***Socko v. Mid-Atl. Sys. of CPA, Inc.***, 633 Pa. 555, 568, 126 A.3d 1266, 1274 (2015). Restrictive covenants are enforceable only if they are: (1) ancillary to an employment relationship between an employee and an employer; (2) supported by adequate consideration; (3) the restrictions are reasonably limited in duration and geographic extent; and (4) the restrictions are designed to protect the legitimate interests of the employer. ***Id.*** "Pennsylvania courts have historically been reluctant to enforce contracts that place restraints on trade or on the ability of an individual to earn a living; however, post-employment non-competition covenants are not *per se* unreasonable or unenforceable." ***WellSpan Health v. Bayliss***, 869 A.2d 990, 996 (Pa.Super. 2005).

"[A] covenant not to compete must be reasonably limited in both time and territory." ***Bilec v. Auburn & Assocs., Inc. Pension Tr.***, 588 A.2d 538, 542 (Pa.Super. 1991), *appeal denied*, 528 Pa. 620, 597 A.2d 1150 (1991);

---

[3] We discuss this case in greater detail ***infra***.

***Martin Indus. Supply Corp. v. Riffert***, 530 A.2d 906, 908 (Pa.Super. 1987) (stating "such agreements must have a reasonable limitation in geographic extent"). ***See also Commonwealth Physician Network, LLC v. Kutz***, No. 1242 MDA 2023, 2025 WL 844947, at \*8 (Pa.Super. filed Mar. 18, 2025) (unpublished memorandum) (stating "the temporal and geographical restrictions imposed on the ex-employee must be reasonably limited").[4]

When a non-compete covenant imposes geographical restrictions broader than necessary to protect the employer, the Pennsylvania Supreme Court has held that a court may grant enforcement limited to those portions of the restrictions which are reasonably necessary for the protection of the employer. ***Sidco Paper Co. v. Aaron***, 465 Pa. 586, 595, 351 A.2d 250, 254 (1976). "In other words, a court of equity may not only remove an offensive term, but may supply a new, limiting term and enforce the covenant as so modified." ***Bell Fuel Corp., supra*** at 457. The court, however, may not modify and enforce a non-compete covenant that is so broad that it indicates an intent "to oppress the employee and/or to foster a monopoly, either of which is an illegitimate purpose. An employer who extracts a covenant in furtherance of such a purpose comes to the court of equity with unclean hands and is, therefore not entitled to equitable enforcement of the covenant." ***Sidco Paper Co., supra*** at 599, 351 A.2d at 257.

---

[4] ***See*** Pa.R.A.P. 126(b) (stating we may rely on unpublished decisions of this Court filed after May 1, 2019 for their persuasive value).

"In Pennsylvania, an otherwise valid restrictive covenant which is geographically overbroad is 'divisible and enforceable [once it has been limited by the court] to reasonable geographical limits.'" ***Quaker City Engine Rebuilders, Inc. v. Toscano***, 535 A.2d 1083, 1089 (Pa.Super. 1987).  A trial court is permitted to "blue line" or "blue pencil" a non-compete provision to make it reasonable, and therefore enforceable.  ***See WellSpan, supra*** at 996 (affirming trial court's authority to "blue line" restrictive covenant and refuse to enforce it in Lancaster County; court enforced covenant in York and Adams counties, where restrictions on doctor/employee's practice and solicitation of referrals were reasonably necessary for employer's protection).  ***See also Prop. Damage Restoration 2, Inc. v. KD Disaster Cleanup, LLC***, No. 1656 EDA 2024, 2025 WL 1393957, at *10 (Pa.Super. filed May 14, 2025) (unpublished memorandum) (affirming trial court's modification of non-compete clause that prevented competition in state of New Jersey to "include only those counties in which [Appellees'] franchises operate").

In cases where a non-compete provision failed to provide an express geographic limitation, our courts have deemed the non-compete clause to contain an implied geographic limitation in certain circumstances.  For example, in ***Bell Fuel, supra***, the Bell Fuel Corporation sought a preliminary injunction to restrain ex-employee Anthony Cattolico from soliciting Bell's customers, using or disclosing Bell's confidential business information, and retaining Bell's confidential business records in violation of the terms of Mr.

Cattolico's employment agreement with Bell. The non-compete provision of the employment agreement stated: "Employee covenants and agrees that Employee will not, during the term of Employee's employment or thereafter, contact or solicit customers of the Company except on behalf of the Company or solicit employees to leave the Company." *Id.* at 452. The trial court found the covenant "void on its face and unmodifiable." *Id.* at 456.

On appeal, this Court agreed that the restrictive covenant was unenforceable on its face due to the lack of an express geographical limitation. Nevertheless, this Court stated that "where the covenant imposes restrictions broader than necessary to protect the employer, we have repeatedly held that a court of equity may grant enforcement limited to those portions of the restrictions which are reasonably necessary for the protection of the employer." *Id.* (quoting *Sidco, supra* at 595, 351 A.2d at 254). This Court continued:

> It is clear that the covenant contains no express temporal or geographic limitations. However, we find that the only proper and reasonable construction of the covenant reveals **an implied geographic limitation**. Since the covenant only prohibits Cattolico from soliciting customers (its prohibition of employee solicitation not being at issue here), **and does not generally restrain Cattolico from engaging in any other activity or in any business that is competitive with Bell**, the actual geographic scope of the covenant is easily determined to be the territory in which Bell's actual customers are located. Although we cannot define this territory based on the record before us, which contains no list of customers, the trial court certainly can make this determination simply by receiving the appropriate evidence on remand. If this geographical limitation is not overly broad, then the court can simply enforce it. If it is

- 9 -

too broad, the court can modify the agreement to provide a more reasonable geographical limitation.

Thus, the question is overall reasonableness, to be judged against the employer's needs and the impact on the employee. In the instant case, the impact on the employee is limited to the inability directly to lure away Bell's customers. **If Cattolico wishes, he may set up shop next door to Bell in a directly competitive business or he may work for any of Bell's competitors**. He simply may not solicit Bell's customers or use or disclose Bell's protectible confidential business information. Thus, the covenant is not *prima facie* unreasonable ….

*Id.* at 458-60 (emphasis added). Thus, this Court reversed the trial court's conclusion that the non-compete clause was unmodifiable, "[g]iven the inherent geographic limitation, coupled with the fact that the covenant restricts only one activity[.]" *Id.* at 459.

In **Plunkett Chem. Co. v. Reeve**, 373 Pa. 513, 95 A.2d 925 (1953), the Pennsylvania Supreme Court reached a similar conclusion concerning an inherent geographic limitation in an ex-employee's non-compete provision. Specifically, Plunkett Chemical Co. "was engaged in the business of dealing in insecticides, disinfectants, cleaners, polishers, and equipment used in connection therewith, sanitation services and matters incidental thereto." *Id.* at 513, 95 A.2d at 926. Reeve was employed as a salesman, maintenance technician and service supervisor. His employment contract stated:

Second party agrees that upon the termination of this agreement in accordance herewith he will not directly or indirectly, within a period of one year thereafter, engage in the same or similar line of business as that now carried on by first party, or engage to work for any individual, firm or corporation engaged in such line or similar line of business.

- 10 -

*Id.* at 513-15, 95 A.2d at 926 (internal quotation marks omitted). On appeal, Reeve argued that because the clause "contains no limitation on the area or space covered thereby," it was void on its face. *Id.* at 515, 95 A.2d at 926. The Superior Court "determined that the [clause], even though unlimited in space, should receive a reasonable construction. The [C]ourt limited its preliminary injunction to the territory provided in the original contract and the riders thereto." *Id.* at 517, 95 A.2d at 927. The territories provided in the original contract were the city of Philadelphia, Delaware County, parts of Chester County, three counties in New Jersey, the city of Camden in New Jersey, and Doylestown in Bucks County. The Supreme Court affirmed this Court's ruling. In doing so, our high Court recognized that while the contract was silent as to the geographical limitation of the non-compete, "where there is no express limitation in space, the courts will endeavor to interpret the contract as providing for a reasonable limitation in view of the attendant circumstances." *Id.* at 516, 95 A.2d at 927. The reasonable limitation, in this case, were the territories described in Reeve's original contract.

By contrast, in ***Martin Indus. Supply Corp., supra***, this Court held that a non-compete provision was unenforceable against an ex-employee because it lacked an express geographic limitation. In that case, Martin Industrial Supply Co. ("Martin") hired James Riffert to be a salesman. His job was to advertise various products and supplies used in maintaining commercial properties. *Id.* at 906. As part of his employment, Mr. Riffert

signed a non-compete agreement, which stated:

> FOR GOOD CONSIDERATION, and in consideration of my being employed by MARTIN INDUSTRIAL SUPPLY CORPORATION, I, the undersigned, hereby agree that upon my termination of employment and notwithstanding the cause of termination, I shall not compete with the business of Martin Industrial Supply Corporation, or its successors or assigns.
>
> **The term 'not compete' as used in this agreement means that I shall not directly or indirectly own, be employed by or work on behalf of any firm engaged in a business substantially similar and competitive with Martin Industrial Supply Corporation.**
>
> This non-compete agreement shall remain in full force and effect for two years commencing with the date of employment termination.

*Id.* at 908 (emphasis added). Within 14 months of signing the agreement, Mr. Riffert left Martin and began working for another company named Lindly Supply Company. Martin filed a complaint, seeking to enforce the non-compete and filed a motion for a preliminary injunction to enjoin Mr. Riffert from violating the agreement. The trial court denied the preliminary injunction, holding that the agreement had no express geographical limitation, "which made its restriction, by its term, apply worldwide." *Id.*

On appeal, Martin argued that the non-compete provision was inherently geographically limited, "defined … as the area [Martin] currently conducts business in." *Id.* This Court rejected Martin's argument, stating: "[Martin] failed to restrict the geographical parameters of the non-competition agreement in the agreement itself. This fact alone makes the terms of the

agreement overbroad because such agreements must have a reasonable limitation in geographic extent." ***Id.*** (quoting ***Sidco, supra*** at 591, 351 A.2d at 252). This Court continued:

> We reject [Martin's] argument that the geographical area was defined by the agreement's restricting Riffert from competing with [Martin], as the area [Martin] currently conducts business in. [Martin's] president testified that [Martin's] area of business included the states of New Jersey, Delaware, Maryland and Pennsylvania. Such a radius can be easily viewed as overbroad and we do not hold the trial court's finding it as such, to be unreasonable. **Additionally, we find no abuse of discretion on the trial court's part in refusing to rewrite or modify the non-competition agreement to include a specific geographic area or shorter duration, as [Martin] suggests it could have.**

***Id.*** (internal citation omitted) (emphasis added).

Instantly, the trial court granted summary judgment in favor of Doctor on Allegheny Clinic's breach of contract claim, reasoning as follows:

> This [c]ourt's decision is simple: All claims in this litigation turn on the non-compete clause contained in the Employment Agreement, but that non-compete clause is unenforceable under Pennsylvania law due to either (1) its lack of an explicit reasonable geographic limitation or (2) the inclusion of an excessively burdensome geographic limitation, invoking the doctrine of unclean hands.
>
> The non-compete clause in [Doctor's] Employment Agreement with Allegheny Clinic is unenforceable due to its lack of a geographic limitation. … While the non-compete clause lists categories of types of businesses [Doctor] cannot work for, the clause does not provide an explicit geographic limitation, making the use of the term "competitor" unclear. Because there is no geographic limitation provided, the [c]ourt could stop here in its analysis and declare the non-compete agreement to be unenforceable.

Where there is not an explicit geographic limitation, "a court of equity **may** grant enforcement limited to those portions of the restrictions which are reasonably necessary for the protection of the employer." [***Sidco, supra*** at 595, 351 A.2d at 254]. But where a geographic limitation is grossly excessive, the Pennsylvania Supreme Court has recognized that the courts must protect employees as well:

> [O]verbreadth militates against enforcement because it indicates an intent to oppress the employee and/or to foster a monopoly, either of which is an illegitimate purpose. **An employer who extracts a covenant in furtherance of such a purpose comes to the court of equity with unclean hands and is, therefore not entitled to equitable enforcement of the covenant.**

*Id.* at 599, 351 A.2d at 257 (emphasis added).

* * *

In its Brief in Support of Its Motion for Summary Judgment, Allegheny Clinic argues that non-compete clauses are enforceable if they are inherently limited in geographic scope. Pl. Allegheny Clinic's Br. in Supp. of Its Mot. for Summ. J., at 13. They argue that the Employment Agreement "bars [Doctor] from leaving [Allegheny Clinic] for competitors of its breast radiology practice—*i.e.*, competitors in Western Pennsylvania." *Id.* This statement is a blatantly false misrepresentation to this [c]ourt.

The language of the non-compete agreement does not stop at barring [Doctor] from working for competitors of Allegheny Clinic's breast radiology practice in Western Pennsylvania as Allegheny Clinic now claims it does. The non-compete agreement bars [Doctor] from working for "1) UPMC and its affiliates as well as 2) any other competitor of [Allegheny Clinic], AHN or other health care facility with which [Allegheny Clinic] has had a contract, relationship or affiliation to provide professional radiology services." …

In part, the non-compete agreement bars [Doctor] from working for "UPMC and its affiliates," which, according to

UPMC's website, includes locations in Southwestern Pennsylvania, Northwestern Pennsylvania and New York, Central Pennsylvania, North Central Pennsylvania, West Central Pennsylvania, and Maryland and West Virginia. *All UPMC Locations*, UPMC, https://www.upmc.com/locations (last visited May 15, 2024). This includes, for example, UPMC Chautauqua, which provides breast radiology services, and is a 171-mile drive from Allegheny Clinic. *UPMC Imaging Services at UPMC Chautauqua*, UPMC, https://www.upmc.com/locations/hospitals/chautauquaiser vices/imaging (last visited May 15, 2024).

In addition to UPMC and its affiliates, the non-compete agreement bars [Doctor] from working for any other competitor of Allegheny Clinic or **AHN** (*Allegheny Health Network*). Like UPMC, AHN has an extensive network of healthcare facilities, including a facility in Erie Pennsylvania, a 125-mile drive from Allegheny Clinic. *Location Search*, AHN, https://www.ahn.org/location-search?ft=ahn: locations/facility-type/outpatient-surgery-center (last visited May 15, 2024).

One of Allegheny Clinic's witnesses admitted that the Cleveland Clinic is also considered a competitor of Allegheny Clinic, Br. in Opp'n to Pl.'s Mot. for Summ. J., Ex. 1 at 134, and it is a generally well-known fact that the Cleveland Clinic is a competitor of both AHN and UPMC. In fact, the Cleveland Clinic operates an imaging facility in Boardman, Ohio, a mere 59.7-mile drive from Allegheny Clinic. *Boardman STAR Imaging*, Cleveland Clinic, https://my.clevelandclinic.org/locations/directions/221-boardnian-star-imaging (last visited May 25, 2024). But the Cleveland Clinic has imaging and radiology facilities as far as Dayton, Ohio, a 264-mile drive from Allegheny Clinic. *Dayton Imaging — Far Hills Avenue*, Cleveland Clinic, https://my.clevelandclinic.org/locations/directions/443-dayton-imaging-far-hills-avenue (last visited May 25, 2024).

If Allegheny Clinic wants this [c]ourt to interpret the non-compete language as being inherently limited in scope, this [c]ourt would find that the inherent geographic limitation in this non-compete agreement extends as far as at least 264 miles, which is gratuitously overly broad and certainly

indicates an intent to oppress [Doctor] or to foster a monopoly. As such, this [c]ourt finds that the non-compete agreement between Allegheny Clinic and [Doctor] is unenforceable.

(Trial Court Opinion at 4-8) (emphasis in original).

The record supports the trial court's analysis. The non-compete agreement at issue in this case lacks any express geographic limitation as required for enforcement. *See Socko, supra*; *Bilec, supra*. The trial court entertained Allegheny Clinic's request to find an implied geographic limitation, but the court ultimately found it was excessively burdensome on Doctor. We agree with this assessment for the reasons outlined by the court above.

Further, we cannot say that the court erred or abused its discretion by declining to "blue line" the non-compete clause to include a specific geographic area to make it enforceable.[5] *See Martin Indus. Supply Corp, supra*. Although Allegheny Clinic analogizes this case to the facts in *Bell Fuel*, that case is distinguishable from the facts at bar. In *Bell Fuel*, the non-compete clause simply prevented the ex-employee from soliciting customers within his inherent geographical territory. The Court found that the inherent "geographic scope of the covenant [was] easily determined to be the territory in which Bell's actual customers are located." *Bell Fuel, supra* at 458. Here,

_____

[5] Although Allegheny Clinic raises claims on appeal challenging the court's discussion of how it could potentially "blue line" the non-compete clause, the record indicates that the court ultimately declined to do so and provided such a discussion as either a hypothetical or alternative rationale. Thus, we decline to address Allegheny Clinic's claims in this respect.

Allegheny Clinic's "actual customers" are not so easily located. Allegheny Clinic's non-compete clause prevents Doctor from entering into "any type of financial, ownership, strategic, or medical staff relationship with 1) UPMC and its affiliates as well as 2) any other competitor of [Allegheny Clinic,] AHN or other health care facility with which [Allegheny Clinic] has had a contract, relationship or affiliation to provide professional radiology services." (**See** Allegheny Clinic's App. of Exs. in Supp. of Its Mot. for Summ. J., Ex. 2, at 3; R.R. at 190a). As this Court recognized in **Bell Fuel**, "[i]f Cattolico wishes, he may set up shop next door to Bell in a directly competitive business or he may work for any of Bell's competitors." **Bell Fuel, supra** at 459. The same cannot be said for Allegheny Clinic's non-compete clause, which expressly prohibits competition. Thus, Allegheny Clinic's non-compete clause is overbroad and unreasonable. **See Martin Indus. Supply Corp, supra**.

Allegheny Clinic also relies on **Plunkett, supra**, to suggest that this Court find an inherent geographic limitation through the attendant circumstances of the contract.[6] Nevertheless, Allegheny Clinic's contract does not "provide for a territory" as the contract did in **Plunkett**. **Compare Plunkett, supra**. On the record before us, the trial court properly granted summary judgment in favor of Doctor because the non-compete clause at

_____

[6] Allegheny Clinic also relies on various unpublished decisions from this Court filed before May 1, 2019. (**See** Allegheny Clinic's Brief at 18, 25, 26). We may not consider these cases on appeal, and we remind counsel that such cases cannot be cited in appellate briefs. **See** Pa.R.A.P. 126(b).

issue was unenforceable. ***See Summers, supra***; ***Valley Nat'l Bank, supra***.

Therefore, Allegheny Clinic's first issue on appeal merits no relief.

In its second issue, Allegheny Clinic argues that SHRA engaged in a scheme to recruit Doctor despite knowing about the non-compete provision in Doctor's employment agreement. Allegheny Clinic complains that the record shows that SHRA attempted to lure Doctor, as well as other radiologists, away from Allegheny Clinic.[7] Allegheny Clinic contends that SHRA intentionally and improperly interfered with Allegheny Clinic's contract with Doctor by attempting to recruit her. Allegheny Clinic concludes that the trial court erred by dismissing its claim against SHRA for tortious interference with contractual relations, regardless of the court's determination on the enforceability of the non-compete clause. We disagree.

The elements of a claim for tortious interference of a contract are:

_____

[7] SHRA argues that Allegheny Clinic claims for the first time on appeal that SHRA attempted to lure other radiologists to its practice. Regardless, Allegheny Clinic's argument on appeal on this point merely states "[t]he record also indicates that SHRA's underhanded recruitment of Allegheny Clinic's radiologists was not limited to [Doctor], but included at least one other Allegheny Clinic radiologist." (Allegheny Clinic's Brief at 30-32) (citing to testimony from Dr. Klepchick that Dr. Klepchick reached out to Dr. Schendel about joining SHRA around same time that Dr. Klepchick reached out to Doctor; claiming that Dr. Klepchick inquired whether radiologists in Allegheny Clinic's fellowship program would be interested in joining SHRA). Allegheny Clinic does not attempt to develop an argument regarding each element of the test for tortious interference with contractual relations related to SHRA's interactions with Dr. Schendel, or any other radiologist aside from Doctor. Thus, Allegheny Clinic's claims of tortious interference concerning anyone other than Doctor are waived on appeal. ***See*** Pa.R.A.P. 2119 (discussing requirements of argument section of appellate brief).

> (1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct.

*Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 933 (Pa.Super. 2013) (quoting *Walnut St. Assoc., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa.Super. 2009), *aff'd*, 610 Pa. 371, 20 A.3d 468 (2011)).

The second element,[8] the intent to interfere with a contractual relationship, concerns "whether there is a sufficient allegation of specific intent. It must be emphasized that the tort we are considering is an intentional one: the actor is acting as he does [f]or the purpose of causing harm to the plaintiff." *Glenn v. Point Park Coll.*, 441 Pa. 474, 481, 272 A.2d 895, 899 (1971). *See also Phillips v. Selig*, 959 A.2d 420, 429 (Pa.Super. 2008), *appeal denied*, 600 Pa. 764, 967 A.2d 960 (2009) (stating: "The second element requires proof that the defendant acted 'for the specific purpose of causing harm to the plaintiff'") (internal citation omitted).

"The third element contains the requirement that the plaintiff allege the absence of privilege or justification. This requirement mandates that the plaintiff provide proof that the defendant's actions were improper." *Foster v.*

---

[8] For purposes of our disposition, we focus on the second and third elements of this cause of action.

- 19 -

***UPMC S. Side Hosp.***, 2 A.3d 655, 666 (Pa.Super. 2010), *appeal denied*, 608

Pa. 647, 12 A.3d at 371 (2010).  This Court has set out the relevant standards

for evaluating this factor:

> The third element requires proof that the defendant's actions were improper under the circumstances presented, which is determined in accordance with the factors listed in Restatement section 767:
>
>> In determining whether an actor's conduct in intentionally interfering with a contract ... is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.
>
> Restatement (Second) of Torts § 767 (1979).  The second and third elements of the tort of intentional interference with contractual relations are closely related, as our Supreme Court has acknowledged that in most cases the defendant's intentional conduct is done "at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff...." [***Glenn, supra*** at 482, 272 A.2d at 899.]
>
> In applying these factors, comment b to section 767 is also instructive:
>
>> The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation.  This Section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it

does not exhaust the list of possible factors.

> Restatement (Second) of Torts § 767 cmt. b (1979). In making this "choice of values" in individual cases, our Supreme Court has advised that when the purpose of the defendant's conduct is, in whole or in part, to protect a legitimate right or interest that conflicts with the interests of the plaintiff, "a line must be drawn and the interests evaluated." [**Glenn, supra** at 482, 272 A.2d at 899.] Although this evaluation of interests is not always susceptible of "precise definition," it is clear that the central inquiry is whether the defendant's conduct is "sanctioned by the 'rules of the game' which society has adopted."

**Phillips, supra** at 429-30 (citation removed).

Instantly, our review of the record indicates that while Doctor was working for Allegheny Clinic, she communicated with Dr. Klepchick, a SHRA radiologist who formerly worked with Doctor at Allegheny Clinic. Dr. Klepchick and Doctor have known each other since 2013. (**See** Allegheny Clinic's App. of Exs. in Supp. of Its Mot. for Summ. J., Ex. 3, Excerpt of Deposition Transcript of Bibianna Klepchick, M.D., 9/27/22, at 26; R.R. at 214a). The record shows that they exchanged text messages in December 2020 regarding Dr. Klepchick's role at SHRA. (**See** Allegheny Clinic's App. of Exs. in Supp. of Its Mot. for Summ. J., Ex. 12, at unnumbered 2-7; R.R. at 363a-368a). Dr. Klepchick explained that she was "in charge of breast imaging over here," to which Doctor replied, "That's awesome[. Are] you hiring[?]" (**Id.** at unnumbered 2; R.R. at 363a). Dr. Klepchick told Doctor that there were no available positions at that moment, and Doctor texted back, writing "[i]f something ever comes up let me know and I'll consider it." (**Id.** at

unnumbered 3-4; R.R. at 364a-365a). Doctor mentioned to Dr. Klepchick that her contract with Allegheny Clinic did not end until June 30, 2021.[9] (*Id.* at unnumbered 5; R.R. at 366a). Dr. Klepchick told Doctor that she would mention the potential opportunity to Dr. Andrus, the lead physician at SHRA. (*Id.* at unnumbered 7; R.R. at 368a).

Six months later, in June 2021, Dr. Klepchick texted Doctor to follow up about their prior conversation about working at SHRA. (*See* Allegheny Clinic's App. of Exs. in Supp. of Its Mot. for Summ. J., Ex. 6, at unnumbered 1; R.R. at 287a). Dr. Klepchick followed up again on August 6, 2021, explaining that a position had opened up and they were looking for a radiologist for January 2022. (*Id.* at unnumbered 5; R.R. at 291a). Dr. Klepchick texted Doctor, stating "if you are interested or know somebody who is, please let me know." (*Id.*) Doctor replied, "Ok… too bad it's not summer 2022…!" (*Id.*) Dr. Klepchick answered that "[w]e could [probably] wait if you were truly interested[.]" (*Id.*) Doctor responded that she would need to know more about the contract; and Dr. Klepchick said he would have Dr. Andrus call Doctor. (*Id.* at unnumbered 6-7; R.R. at 292a-293a). Dr Klepchick texted that she would step aside and let Doctor and Dr. Andrus figure out the remaining details, as she did not want to get into "hot water" with AHN. (*Id.* at unnumbered 6; R.R. at 292a).

---

[9] Doctor misspoke during this text message exchange and later realized that her contract with Allegheny Clinic was set to end on June 30, **2022**.

SHRA ultimately decided to offer Doctor employment and in September 2021, Dr. Andrus emailed Doctor with SHRA's letter of intent and first year employment agreement attached. (**See** Allegheny Clinic's App. of Exs. in Supp. of Its Mot. for Summ. J., Ex. 7; R.R. at 298a). Dr. Andrus explained that Doctor would need to send over the current contract she had with Allegheny Clinic, because he did not want to "[impinge] on anything in your current contract that would preclude your employment for next year." (**Id.**) Dr. Andrus specifically asked to see "the wording that they used for both your notice period and [restrictive] covenant[.]" (**Id.**) On October 7th, Doctor emailed Dr. Andrus the restrictive covenant in her employment contract for his review. (**See** Allegheny Clinic's App. of Exs. in Supp. of Its Mot. for Summ. J., Ex. 8; R.R. at 300a). That same day, Dr. Andrus emailed Doctor back, stating, "I reviewed and I think we are in the clear for the term and non-compete agreement." (**Id.**)

As the trial court accurately stated:

> [Doctor] ultimately decided to accept the opportunity SHRA provided her, signing an employment agreement with SHRA on October 14, 2021. She proffered a resignation letter to Allegheny Clinic two months later, wherein she detailed her new employment arrangements. In response, Allegheny Clinic sent [Doctor] a letter on January 31, 2022, explaining that transitioning to SHRA would violate her Employment Agreement. [Doctor] went forward with the new employment arrangements, however, and formally began working for SHRA on July 5, 2022.
>
> Shortly before [Doctor] began working for SHRA, on July 1, 2022, Allegheny Clinic initiated the present action by filing a complaint against her and SHRA.

- 23 -

(Trial Court Opinion at 2).

On this record, Allegheny Clinic has failed to establish facts to succeed on the second and third elements of its claim for tortious interference with contractual relations against SHRA.[10] The record shows that Doctor communicated via text with Dr. Klepchick, a long-time colleague, regarding her position at SHRA. After texting with Dr. Klepchick and hearing about her role at SHRA, **Doctor** expressed interest in working at SHRA, asked if SHRA was hiring, and inquired about any available positions.[11] (**See** Allegheny Clinic's App. of Exs. in Supp. of Its Mot. for Summ. J., Ex. 12, at unnumbered 2-7; R.R. at 363a-368a). Doctor continued to express interest in working with SHRA six months later, despite knowing that she would not earn as much money as she did with Allegheny Clinic. (**See** Allegheny Clinic's App. of Exs. in Supp. of Its Mot. for Summ. J., Ex. 6, at unnumbered 3, 7; R.R. at 289a, 293a). During her exchanges with Dr. Klepchick, Doctor explained that she was expecting her second child soon and was satisfied with a lower salary if it

---

[10] Although our rationale differs from that of the trial court, this Court can affirm on any valid ground. **See generally Prieto Corp. v. Gambone Const. Co.**, 100 A.3d 602 (Pa.Super. 2014) (explaining that appellate court may affirm on any basis).

[11] Notably, in its appellate brief, Allegheny Clinic stated that "[o]n June 21, 2021, Dr. Klepchick initiated the scheme to recruit [Doctor] sending a text message to [Doctor]…" (Allegheny Clinic's Brief at 8). Allegheny Clinic ignores the fact that Doctor was the one who asked Dr. Klepchick in December 2020 to reach out to her if any positions became available at SHRA.

meant more time with her young children. (*Id.* at unnumbered 7; R.R. at 293a). Thus, Dr. Klepchick forwarded Doctor's information to Dr. Andrus, and together they worked out the details of her employment with SHRA.

SHRA reviewed Doctor's non-compete clause in her employment contract with Allegheny Clinic and correctly concluded (as we have previously decided ***supra*** in our disposition of Allegheny Clinic's first appellate issue) that the non-compete clause was unenforceable. SHRA sent Doctor an employment agreement, with a start date of July 5, 2022, **after** the June 30, 2022 expiration date of Doctor's contract with Allegheny Clinic. Doctor also provided Allegheny Clinic with six months' notice in advance, alerting Allegheny Clinic that she was not planning to renew her employment contract and would seek employment elsewhere.

Given that Doctor was the one who asked Dr. Klepchick if SHRA was hiring and inquired about any available positions, the record belies Allegheny Clinic's assertion that SHRA "poached" Doctor from Allegheny Clinic or sought to harm Allegheny Clinic by offering Doctor an employment opportunity. Further, we cannot say that this sequence of interactions and communications constitutes "improper conduct." Specifically, there is nothing in the law, nor enforceable in Allegheny Clinic's contract, that precluded Doctor from interacting with Dr. Klepchick, learning about her role at SHRA, and ultimately accepting a job offer from SHRA. On this record, Allegheny Clinic has failed to establish facts to satisfy the second and third elements of its cause of action

against SHRA. ***See Glenn, supra***; ***Foster, supra***; ***Phillips, supra***. Thus, the court properly entered summary judgment in SHRA's favor.[12] ***See Summers, supra***; ***Valley Nat'l Bank, supra***. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

10/7/2025

---

[12] Notwithstanding the phrasing of Allegheny Clinic's issues as raised in its statement of questions presented, Allegheny Clinic's final issue on appeal concerns the damages element of its claim of tortious interference against SHRA. Based on our disposition of issue two, we need not address Allegheny Clinic's claims concerning whether it established facts on the element of damages relevant to its tortious interference claim against SHRA. ***See Lake Ariel Recovery Center, LLC v. C & E Investors, Inc.***, No. 2695 EDA 2022 (Pa.Super. filed Jan. 10, 2025) (stating as there are four elements necessary to establish claim for tortious interference with contractual relations, failure to satisfy any given element is fatal to claim).